### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### AT PADUCAH
#### (Filed Electronically)

**CRIMINAL ACTION NO.  5:06CR-19-R**
**UNITED STATES OF AMERICA,**                                          **PLAINTIFF,**


**vs.**


**STEVEN DALE GREEN,**                                                  **DEFENDANT.**

### DEFENDANT'S POST-HEARING BRIEF ON
### MOTION TO SUPPRESS STATEMENTS

Comes the Defendant, Steven Dale Green, by counsel, and files this brief in support of his Motion to Suppress Statements allegedly made to law enforcement.  The Court has held an evidentiary hearing on this matter, and the United States has filed a post-hearing brief ("Government's Brief").  In support of its motion, the defense states as follows:


**I.        Introduction**

This matter involves statements the defendant allegedly made to law enforcement on the date of his arrest (June 30, 2006) and July 3, 2006.  In sum, FBI Agents testified that Mr. Green was arrested near Asheville, North Carolina on June 30, 2006.  After his arrest and while being transported to the local jail, the FBI alleges that Green made statements that have been provided by the United States in discovery.  Similarly, the FBI alleges Green made statements on July 3, 2006, when he was transported from Asheville to Charlotte, North Carolina for his initial appearance.

It is uncontroverted that Green was in law enforcement custody prior to making the alleged

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

1

statements.  It is also uncontroverted that law enforcement never advised Green of his *Miranda* warnings at any time.  Similarly, it is uncontroverted that Green asserted his right to counsel at the time of his arrest and before making any of the alleged statements in question.

What is at issue is whether law enforcement engaged in questioning, or the functional equivalent of questioning, of Green that would have necessitated *Miranda* warnings.  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Additionally, the testimony from the suppression hearing raised questions of whether the government violated Federal Rule of Criminal Procedure 5(a), 18 U.S.C. § 3501(c), and the Sixth Amendment right to counsel as it relates to the alleged statements of July 3, 2006.  As to these issues, the testimony from the suppression hearing demonstrates that Green should have been taken without unnecessary delay to the local courthouse in Asheville for his initial appearance on July 3rd.  Instead, he was transported two hours away to Charlotte, and during that transport, allegedly made additional statements to the FBI about matters related to the case. The question thus is whether the government violated Rule 5, § 3501(c) and the Sixth Amendment by not presenting Green without unnecessary delay for an initial appearance in Asheville as opposed to driving him two hours away to Charlotte, during which time the FBI obtained additional statements from him.

## II.   *Miranda* requires suppression of any alleged statements by Green to law enforcement.

The police must advise in-custody suspects of *Miranda* warnings before questioning them. *Miranda v. Arizona*, 384 U.S. 436 (1966).  Again, there is no dispute that Green was in custody at the time of the alleged statements.[1]  It is also uncontroverted that law enforcement never advised

---

[1]   Government's Brief, pg. 1; Supp. Hrng. "TR" at 5.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

2

Green of his *Miranda* rights.[2]  It is also undisputed the Green asserted his Fifth Amendment right to counsel prior to making any alleged statements to law enforcement.[3]  Again, the dispute is whether any of Green's statements were the subject of police questioning or the functional equivalent, thus requiring compliance with *Miranda*.  The government bears the burden of demonstrating compliance with *Miranda*.  *Id.* at 479.

In *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), the Supreme Court defined "police questioning" for *Miranda* purposes to include "either express questioning or its functional equivalent."  Green's statements to law enforcement were the product of both "express questioning" and "its functional equivalent."  The Court in *Innis* held:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to **either express questioning or its functional equivalent**. **That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.** ... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301 - 03 (emphasis added).
>
> ....
>
> By "incriminating response" we refer to any response--whether inculpatory or exculpatory--that the prosecution may seek to introduce at trial. As the Court observed in *Miranda* : "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects

---

[2]     Government's Brief, pg. 1;  TR at 9.

[3]     TR at 39.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

3

the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement." 384 U.S., at 476-477, 86 S.Ct., at 1629.  *Innis*, 446 U.S. at 302, FN 5.

In *United States v. Rambo*, 365 F.3d 906 (10th Cir.2004), the Tenth Circuit noted a situation where the "functional equivalent" of questioning by the police occurred, even if there were no direct questioning.  In *Rambo*, the court held that the police making statements like "if you want to talk to me about this stuff, that's fine" was the functional equivalent of questioning because it was likely to result in an incriminating response.  *Rambo*, 365 F.3d at 909 - 10.  The court in *Rambo* also held:

> While the district court concluded that the lack of questions indicated there was no interrogation by Moran, the use of questions is not required to show that interrogation occurred. In *Rhode Island v. Innis*, the Supreme Court held that interrogation encompasses not only questioning but **"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."** 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnote omitted). The test of whether an interrogation has occurred is an objective one. *United States v. Gay*, 774 F.2d 368, 379 n. 22 (10th Cir.1985). The focus is on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer. *Id.* citing *Innis*, 446 U.S. at 301, 100 S.Ct. 1682 (emphasis added).[4]

---

[4]    See also, e.g., *United States v. Ortiz*, 177 F.3d 108, 109 - 10 (1st Cir. 1999) (functional equivalent of interrogation when police asked defendant if he wanted to cooperate); *United States v. Montana*, 958 F.2d 516 , 518 2nd Cir. 1992) (functional equivalent of interrogation when suspect told that any cooperation would be brought to the prosecutor's attention); *United States v. Tyler*, 164 F.3d

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

4

The government essentially argues that Green initiated conversation with the FBI, that the FBI did not question Green, and thus *Miranda* rights were unnecessary. As outlined below, the suppression hearing testimony supports the conclusion that the FBI engaged in both the functional equivalent of questioning, and the direct questioning of Green, and that this questioning violated the 5th Amendment and *Edwards v. Arizona*, 451 U.S. 477 484-485 (1981).  Even assuming *arguendo* that Green did speak first by asking the FBI a question,[5] the FBI by its own admission engaged Green in conversation and asked questions of him.  In sum total, the FBI estimated it spent about two hours and forty-five minutes in transport with Green over the two days in question. Forty-five minutes on the trip from the scene of Green's arrest to the Asheville jail,[6] and two hours from Asheville to Charlotte three days later.[7]  The FBI estimated that about thirty minutes of the first trip was filled with conversation between the FBI and Green.[8]  Similarly, the FBI estimated that the "majority" of the second, two-hour trip was filled with conversation between law enforcement and Green.[9]

There was no recording taken of Green's alleged statements to the FBI as the FBI prohibits the tape recording of witnesses or suspects.  Similarly, the agents took no notes regarding Green's statements.  The only reported memorialization of the statements were two FBI reports ("302s")

---

150, 155 (3rd Cir. 1998) (police had conversation with in-custody defendant for about an hour, when police told suspect to "tell the truth" about the crime in question, it was functional equivalent of questioning in violation of *Miranda*).

[5]    The FBI claims that while taking Green to the Asheville jail that Green allegedly asked "You probably think I'm a monster" or something to that effect. (TR at 40).

[6]    TR at 32; 87.

[7]    TR at 49.

[8]    TR at 80 - 81.

[9]    TR at 91.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

transcribed at a date different than the date the statements were made.  The FBI also admitted at the hearing that Green's alleged statements noted within quotation marks of the 302's may not have been recorded accurately.  Similarly, what the agents said to Green are not reflected in the 302's. Nor was Green allowed to review the 302 and check his alleged statements for accuracy.[10]

### A.      The FBI engaged in the "functional equivalent" of questioning of Green.

FBI Agent Kelley testified that he was the only law enforcement officer to talk to Green about anything of substance on either June 30 or July 3, 2006.[11]  As noted, the government argues that Green's alleged statements were voluntary, were not the product of any law enforcement actions, and that the FBI were merely witnesses to Green's unsolicited remarks.  However, in his testimony, Kelley used or acknowledged the term "conversation" or "conversational" at least seventeen times when describing his interactions with Green on the two days in question.[12]

Unlike a "statement" made by one person, a "conversation" is a two-way exercise involving participation by more than one person.  *Merriam-Webster's Disctionary* defines "conversation" as:

> (1): oral exchange of sentiments, observations, opinions, or ideas
>
> (2): an instance of such exchange : talk <a quiet conversation> b: an informal discussion of an issue by representatives of governments, institutions, or groups c: an exchange similar to conversation (*Merriam-Webster's Dictionary*, available at http://www.merriam-webster.com/dictionary/conversation(last accessed Dec 5, 2008)).

As *Websters* notes, a "conversation" involves an "exchange" between two or more people. Agent Kelley himself admitted that he was not a "*stone*" and did not "*sit there in stony silence*"

---

[10]      TR at 61 - 69; 77.

[11]      TR at 54; 63 - 64.

[12]      TR at 40; 44; 46; 47; 48; 53; 54; 63; 64; 65; 78; 80; 82; 87; 90; 91; 92.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

during his interactions with Green.[13]  To the contrary, Kelley often used the word "conversation" in his testimony when describing his interactions with Green.  Kelley also admitted that he would make comments about the topic of conversation he was discussing with Green,[14] and that he would ask questions of Green during conversation.[15]  Agent Kelley testified that he would ask Green questions such as "*what [Green] meant by something [Green said]*."[16]  As an example, Kelley testified that he might have likely asked Green how his Lieutenant got killed in Iraq when Green mentioned his Lieutenant's murder.[17]  Of course, as noted, the FBI chose not to record, note or have Green confirm what was allegedly said during these conversations, much less did the FBI agents note what they said to Green during their interactions with him.[18]

In support of the fact that the FBI agents conversed with Green rather than just witnessed Green's unsolicited remarks, one only has to look at the FBI's reports about the trips.  Specifically, the FBI 302s breakdown Green's alleged statements on the two trips into two categories.  First, are alleged "statements" by Green.[19]  Second, are "topics,"[20] which were referred to at the suppression hearing as "topics of conversation"[21] between the FBI and Green.  As to Green's alleged

---

[13]    TR at 93; 98 - 99.

[14]    For example, when talking about family members who worked for the railroads, Kelley told Green how his own father worked in the railroad.  TR at 93.

[15]    TR at 45; 84.

[16]    TR at 45.

[17]    TR at 84.

[18]    TR at 61 - 69; 77; Defendant's Exhibits 2 and 3, Agent Kelley's 302s.

[19]    Defendant's Exhibits 2 and 3.

[20]    Id.

[21]    TR at 48.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

7

"statements," such were also called "bullet points" by Agent Kelley at the suppression hearing.[22] Kelley described these alleged "bullet points" by Green as "short, quick statements that [Green] made."[23]

Yet, Agent Kelley's own testimony belies the fact that the "bullet points" or "statements" were not just "short, quick" isolated comments by Green, but were made during conversational exchanges between the FBI and Green. For example, Agent Kelley noted a "bullet point" statement in his second 302 about Green asking him if the Federal system would take into account what happened with him in the Iraq War.[24]  Kelley testified that he answered Green's question as follows:

> And, once again, I responded, 'I don't know.  You know, I'm new to this.  I've never dealt with something like that.  I just don't know. But *I would think that, you know, everything would be brought in that could be brought in*' Something along those lines, because it was my opinion at the time.[25]

This colloquy is important for two reasons.  First, it shows Kelley did not just sit there as a "stone" or a listening post, but instead actively engaged Green in conversation and made remarks that would likely result in Green making statements about case related topics.  Kelley's actions included answering Green's questions and giving Green his opinions, thus, furthering conversation with Green and furthering the chance of Green making more statements about the case.  For example, by telling Green that "everything" about the Iraq War would likely be brought into his

---

[22]   TR at 44.

[23]   TR at 47.

[24]   Defendant's Exhibit 3; TR at 51.

[25]   TR at 51 (emphasis added). Again, Kelley's responses to Green on any matter (whether a "bullet point" statement of Green or a "topic of conversation") were not recorded in Kelley's 302s.  Defendant's Exhibit 2 and 3.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

case, Agent Kelley was encouraging Green to keep talking about subjects like the Iraq War, as such was likely important in the case.

Second, the colloquy shows that Kelley himself thought that many of the topics he discussed with Green (like the Iraq War) were relevant to Green's case and would be admissible at trial. Thus, these "bullet points" and "topics of conversation" were not just idle, irrelevant topics, but were in Kelley's mind relevant to the case. Kelley would not have recorded Green's statements about subjects like the Iraq War in his 302s if he thought that such a subjects were not important to the case. Agent Kelley certainly did not record such things in his 302s like what Green told him about his stay at the Asheville jail, which was a topic Kelley discussed with Green.[26]

Further, Kelley testified that he did not engage in idle chit chat with Green about common small talk subjects like the weather, sports or politics, despite the fact that the "majority" of the two-hour Charlotte trip was filled with conversation, as well as was the initial forty-five minute trip to Charlotte.[27] Thus, if Kelley did not talk with Green about small talk subjects in the almost three hours he spent with Green in the back of a police car, what did they talk about? Apparently matters related to Green's case.

Again, we have no record of what was allegedly said on the trips Asheville and Charlotte, except what the agent testified to and put in his 302s. As the agent admitted, he only put in his 302s what *he* thought was important.[28] He also did not put in his 302 what *he* said to Green.[29] He

---

[26]    TR at 50.

[27]    TR at 80 - 81; 88; 91.

[28]    TR at 77.

[29]    TR at 68- 69; 99; Defendant's Exhibits 2 & 3.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

also testified that he and Green did not engage in small talk[30] event though the *majority* of the two hour trip from Asheville to Charlotte was filled with conversation between the FBI and Green.[31] But, if one reads Agent Kelly's second 302 out loud as to what Green allegedly said on that trip to Charlotte, one can easily read it in less than two minutes.[32]   Even using the most conservative calculation that the "majority" of the trip amounted to only 51% of that two hour time frame, such is still more than one hour of give and take conversation between Kelley and Green.  Yet, we only have two minutes worth of alleged statements of Green recorded by the FBI?

The point is that Agent Kelley clearly (and by his own admission) engaged in conversation with Green for at least one hour, and probably much more than that, on July 3rd.  This followed approximately 30 minutes of conversation with Green on June 30th.  These interactions certainly were not a one sided exercises by Green as suggested by the government.  As noted at the hearing, Agent Kelly has been trained in taking statements, and "likes" to get statements from suspects.[33] Agent Kelley also knew that this was an unusual and serious case as it involved charges of homicide and rape stemming from the Iraq war.[34]Agent Kelley also knew it was a noteworthy case, having seen a "ticker" of the case on a television station like CNN before arresting Green.[35]   Kelley also thought it was logically possible Green would talk with him again on July 3rd, as he allegedly

---

[30]   TR at 88.

[31]   TR at 91. Again, of this two hour trip filled with conversation the majority of the time according to Kelley, *none* of the conversation involved small talk subjects such as the weather, sports, politics etc. TR at 92.

[32]   Defendant's Exhibit 3.

[33]   TR 73 - 74; 97 - 98.

[34]   TR at 34; 60.

[35]   TR at 88 - 89.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

10

did on June 30th.[36]

      The FBI engaging Green in conversation about case related topics for the better part of the almost three hours the agents spent with Green was the "functional equivalent" of questioning as defined in *Innis*, and thus required *Miranda* warnings.  While it is true that if the FBI had *not* engaged Green in conversation, had not answered Green's questions, had *not* given Green opinions about the case, and had *not* asked Green's questions, then Green's alleged statements would have been permissibly obtained despite the absence of *Miranda* warnings.  But such was not the case.  The FBI  actively engaged Green in "topics of conversation" directly tied to his case (such as the Iraq war), gave opinions to Green (especially ones that might seem be favorable to him), and asked questions about matters tied to the case (such as the Iraq war).  These actions by the FBI only encouraged more statements from the defendant about case related subject matters.  The FBI thus engaged in the "functional equivalent" of questioning of an in-custody defendant in absence of *Miranda* warnings.

      Examples of "topics of conversation" between the FBI and Green offered by Agent Kelley at the suppression hearing included how long Green served in the Army;[37] how long Green served in Iraq; [38] that Green had planned to turn himself into the authorities;[39] Green's stay in the Asheville jail;[40] Green's Lieutenant being killed,[41] discussions about the families of Green and Kelley,[42] and

---

[36]    TR at 73.

[37]    TR at 47.

[38]    Id.

[39]    TR at 48.

[40]    TR at 50.

[41]    TR at 84.

[42]    TR at 93.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

11

Green's discharge from the Army.[43]  Other "topics" of conversation that FBI noted in the 302s (but did not testify about at the hearing) included: a month by month account of the casualties in Green's unit in Iraq; Green's compound getting burned down and destroyed by a rocket launcher in Iraq; Green attending a fellow soldier's funeral in the U.S and how the dead soldier's wife cussed at a U.S. Senator about the war; that Green was planning on getting a job and was going to save his Army disability checks; Green's military training; that Green was kicked out of his unit for one month for cussing out a new sergeant; information concerning the manning of security checkpoints in Iraq; and discussing the status of the co-accused in this case.[44]

The government would have the court believe that the FBI agents transporting Green were just passive listeners to *all* of these topics for the almost three hours they spent with Green in transit.  However, a commonly known law enforcement tactic is to make a suspect at ease and to engage them in conversation in order to get the person to talk about subjects related to their case - and that is exactly what the FBI did here.  Then, the Agents made their own report about Green's alleged statements without giving Green the opportunity to review any of them, much less advising him pursuant to *Miranda* that what he said could be used against him in court.

Over the extended time that Agent Kelley (and FBI Agent Grafton who drove) spent with Green on these two occasions, the agents were not passive listening posts or potted plants.  To the contrary, the FBI actively engaged Green.  The FBI's conversations with Green amounted to the "functional equivalent" of questioning requiring *Miranda* warnings as the FBI's words and actions were of the sort "that the police should know [were] reasonably likely to elicit an incriminating response from the suspect."   *Innis*, 446 U.S. at 301.  The FBI's actions of engaging Green in

---

[43]      TR at 55.

[44]      Defendant's Exhibit 2 & 3.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

conversation - by answering his questions, giving opinions, making follow up statements, asking questions etc.- was very reasonably likely to elicit more statements from Green about subjects that both the agent and the government submit are relevant at trial in one way or another. As *Miranda* warnings were never given to Green, his statements to the FBI must be suppressed.

### B.      The FBI questioned Green.

The FBI agents claimed at the hearing that they did not question Green about the case because Green immediately invoked his right to counsel upon arrest. (TR at 9; 26; 27;  39; 41; 45; 99).  Yet, even by Agent Kelley's own testimony, he asked questions of Green regarding topics that: a) Agent Kelley thought were relevant to Green's case;[45] and b) the United States has now provided in discovery as evidence against Green.

Agent Kelley's testimony from the suppression hearing demonstrated how even on the initial transport of Green to Asheville on June 30th, Kelley asked Green *direct questions* in addition to engaging Green in conversation about matters tied to the case. For example, under government questioning at the suppression hearing about June 30th, Kelley testified: *"[Green] would make statements, and you know, I would respond*." Such responses included asking Green questions like *"[W]hat do you mean*?" when discussing a certain topic.[46]

Of course, as to exactly when and regarding what subjects Agent Kelley asked such questions is unclear.  As noted above, Kelley did not outline in his 302s what he said to Green, or what questions he asked Green in their two trips together.[47]  However, by admitting under

---

[45]      TR at 84; Defendant's Exhibits 2 and 3.

[46]       TR at  45.

[47]      Defendant's Exhibits 2 and 3.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

questioning by the government that he *did* ask questions of Green, Agent Kelley undermined the government's argument.

Maybe because he realized his mistake in admitting that he did ask Green, Agent Kelley tried to backtrack on cross examination.  When asked on cross examination about his testimony that he did ask Green questions like "what do you mean" in his interactions with Green on June 30th, Kelley denied ever asking such a question of Green. Kelley testified on cross: *"I don't think I asked ever asked [Green] anything, you know, 'what do you mean' ...  I can't see what situation I would have said that ... it is possible [I asked Green questions like that].  But from things, I can't see what situation I would have said that."*[48]

On the July 3rd trip, Agent Kelley continued his practice of asking Green questions.  First, Kelley admitted that before this second trip, he thought to himself that it was logically possible that Green would converse with him again as he had on June 30th.[49]  As such, almost immediately upon taking custody of Green again on July 3rd, Agent Kelley engaged Green in conversation *by asking him a question*.  Kelley testified that when the FBI picked Green up on July 3rd, he asked Green how was his stay in the Asheville jail.[50]  While that question in and of itself was not about the case, it was a direct question that re-opened the conversational relationship Kelley had established with Green June 30th.  Thus, Kelley engaged Green in conversation immediately by asking him a question, knowing that it was very likely that such would result in them soon talking about matters related to the case again.[51]

---

[48]   TR at 61 - 62.

[49]   TR at 73.

[50]   TR at 50.

[51]   Kelley's 302s do not reflect Green's answers to such questions as how was his stay in the Asheville.  And again, they do not include what statements Kelley

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

14

Agent Kelley also testified about how he likely asked Green questions about subjects that *were* related to the case, such as Green's experiences in the Iraq War. For example, when Green and Kelley were talking again about Green's Lieutenant being murdered in Iraq, Kelley admitted that he very well could have asked Green questions like "*Well, how did that happen?*"[52]   Kelley testified: "*Its possible I did [ask Green how his Lieutenant got killed] you know, just – you know, that's a very tragic thing, you know.*"[53]   Then in his 302 regarding the July 3rd trip, Kelley lists the Lieutenant's death under "topics" of conversation.  Specifically he wrote:

> Squad decoyed into field after rocket launcher-hit by IED- one guy lost legs and arms, LT's face torn off- Platoon down to a few squad members.[54]

Obviously, Kelley's questioning of Green about how the Lieutenant got his face torn off led to the details outlined in the 302 regarding the Lieutenant's death.  Again, Kelley only included in his 302s what *he* thought was important to the case - such as Green's service in the Iraq War. Thus, in addition to engaging in the "functional equivalent" of questioning by holding active conversations with Green, the FBI also engaged in *direct* questioning of Green about subject matters related to Green's case.

Again, Agent Kelley admitted at the suppression hearing that he was not a "stone" during these conversations,[55] nor did he describe Green as a "chatterbox."[56] Kelley's testimony (and logic)

---

made to Green during their two trips together.  They only include what statements Green allegedly made about the case that Kelley thought were important to the case.  TR 77 - 78.

[52]    TR at 84.

[53]    TR at 84.

[54]    Defendant's Exhibit 3.

[55]    TR at 93

[56]    TR at 91.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

15

dictates that he engaged Green in conversation, which included comments, opinions *and* questions by Kelley.  What all direct questions did Agent Kelley ask Green?  We will probably never know. He recorded none of his questions or comments.  What we do know is that Kelley asked Green direct questions about topics related to the case.  Such in itself is sufficient to have required *Miranda* warnings.

The United States argues that Green began a conversation with the agents about the case, the agents were just passive witnesses as it related to subject matters tied to the case, and thus *Miranda* warnings were unnecessary. If the FBI had truly acted as passive listeners, then *Miranda* warnings were unnecessary.  However, by his own admission, Agent Kelley admitted that he asked questions about subject matters related to the case.  Even if *arguendo* Green did initiate conversation with the agents, the FBI responded by engaging Green in conversation, including *specifically asking Green questions* that were likely to result in incriminatory statements by Green.

Similarly, had the FBI advised Green of his *Miranda* rights and Green then initiated conversation about topics related to the case, then Green's actions would very likely be considered a waiver of *Miranda*.  That was not the case either as the FBI never advised Green of his *Miranda* rights, despite the fact that the FBI engaged Green in conversation for the better part of almost three hours together, included asking Green questions related to the case.  Thus, law enforcement's actions violated *Miranda*, and all of Green's alleged statements must be suppressed.

**III.     The government violated Federal Rule of Criminal Procedure 5(a) on July 3, 2006.**

FRCrP 5(a) reads:

(a) In General.

(1) Appearance Upon an Arrest.

(A) A person making an arrest within the United States must take the defendant without unnecessary delay before a

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

magistrate judge, or before a state or local judicial officer as
Rule 5© provides, unless a statute provides otherwise.

(B) A person making an arrest outside the United States must take the
defendant without unnecessary delay before a magistrate judge, unless a
statute provides otherwise.

Rule 5(a) requires exclusion of any statements Green allegedly made on July 3, 2006.  On

that date, Green was not taken before a magistrate judge without unnecessary delay.  As noted,

Green was housed at a detention facility in Asheville, North Carolina, from the evening of June 30,

2006, until July 3, 2006.[57]  Agent Kelley testified that there is a Federal courthouse in Asheville.[58]

Kelley also testified that there is a sitting District Judge and a sitting Magistrate Judge in

Asheville.[59]   However, Green was not taken before a judge in Asheville.  Instead, he was

transported two hours away to the Charlotte courthouse for his initial appearance, and during the

trip, allegedly made statements to Agent Kelley.[60]

Agent Kelley testified that he got instructions over the weekend (between Green's arrest

and the transport to Charlotte) from his supervisor that the United States Attorney's Office had

directed that Green be transported to Charlotte for his initial appearance, instead of the much more

logical Asheville courthouse.[61]  Kelley also admitted that it was logically possible that Green would

talk to Kelley again on the trip Charlotte, like he had done on the night of his arrest.[62]

No rational, much less legal, reason was offered as to why Green was not taken to the

---

[57]     TR at 10; 50.

[58]     TR at 69.

[59]     TR at 70.

[60]     TR at 49.

[61]     TR 70 - 72.

[62]     TR at 73.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

17

Asheville courthouse for his initial appearance before one of the two sitting judges there. Of course, when one looks at the testimony from the suppression hearing, a logical inference can be made that the government wanted to take "another bite of the apple" before Green's initial appearance hoping that he would talk more to the FBI again if he spent two more hours with Agent Kelley without an attorney present. Once Green appeared before a judge for his initial appearance, the Sixth Amendment right to counsel would attach and the government would have no more "bites at the apple" with Green absent the involvement of defense counsel. *Rothgery v. Gillespie County, Texas*, 128 S.Ct. 2578 (2008) (a criminal defendant's initial appearance before a judge marks the beginning of the proceedings against him and triggers the defendant's Sixth Amendment right to counsel ); *Michigan v. Jackson*, 475 U.S. 625, 629-630 (1986) (In which the Court stated, "The Sixth Amendment guarantee of the assistance of counsel also provides the right to counsel at postarraignment interrogations. The arraignment signals 'the initiation of adversary judicial proceedings' and thus the attachment of the Sixth Amendment ... thereafter, government efforts to elicit information from the accused, including interrogation, represent 'critical stages' at which the Sixth Amendment applies." (footnote and other citations omitted); FRCP 44(a) (indigent defendants, like Green, are entitled to counsel from initial appearance through appeal).

As Agent Kelley testified under questioning by the government, he (logically) would "like" to talk to a murder suspect about his or her case if he has the opportunity.[63] In fact, Agent Kelly admitted that in his capacity as the arresting FBI agent in this case, he had planned to talk to Green about his case if possible.[64]

---

[63]   TR at  97.  Interestingly, under questioning by the defense, Agent Kelley for some reason refused to admit that he would "like" to interview the murder suspect on the case he is working.  TR at 74 - 75.

[64]   TR 97 - 98

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

Regardless of the motives of the government for taking the unusual step of transporting Green two hours away for his initial appearance, the fact is that the government did not comply with Rule 5 in that Green was not presented for his initial appearance without "unnecessary delay." "Unnecessary delay" under Rule 5 required the government to present Green to one of the judges in Asheville, not put him in the back of a police car for two more hours with FBI agents before his initial appearance. Transporting Green from Asheville to Charlotte for his initial appearance violated FRCrP 5 and requires suppression of Green's alleged statements of July 3, 2006.

**IV.    The government violated Federal Rule of Criminal 18 U.S.C. § 3501(c) on July 3, 2006.**

18 U.S.C. § 3501(c) "permits the admission of voluntary confessions in federal criminal cases despite any delay in bringing the defendant to a magistrate provided the confession occurs within six hours of arrest, absent a finding by the trial court of reasonable circumstances obviating the six hour rule. *United States v. Johnson*, 215 F.3d 1328 (table) (6th Cir. 2000) (unpublished) (2000 WL 712385, p. 5). Section 3501(c) reads

> (c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and **if such confession was made or given by such person within six hours immediately following his arrest or other detention**: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be **reasonable** considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer. (emphasis added).

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

_____All Green's alleged statements of July 3, 2006, fall outside of the six hour period outlined in the statute. Additionally, there were no reasonable circumstances to permit Green's transportation to Charlotte, which provided the forum for those statements. As outlined above in the section on FRCrP 5, no logical or legal reason was provided as to why Green's initial appearance was not held at the Asheville courthouse on July 3.  As such, said statements must be suppressed under 18 U.S.C. § 3501 (c).


**V.     Green's Sixth Amendment right to counsel was violated on July 3, 2006_____**

A defendant's Sixth Amendment right to counsel attaches at his initial appearance. *Rothgery*, *supra; Michigan v. Jackson, supra.*   Once the Sixth Amendment right to counsel attaches, law enforcement may not question a suspect without the presence of his attorney. *Massiah v. United States,* 377 U.S. 201 (1964)

By taking the unusual step of transporting Green to Charlotte for his initial appearance, the government delayed the attachment of the Sixth Amendment by two hours.  During this two hour delay, law enforcement obtained statements from Green that the prosecution now seeks to introduce against him at trial.  Had the government acted appropriately by taking Green to the Asheville courthouse for his July 3rd initial appearance, the Sixth Amendment would have attached and law enforcement would never have had the chance to interview Green without counsel on July 3rd. Thus, the government subverted Green's Sixth Amendment rights by delaying his initial appearance and giving the FBI another chance to interact again with Green without the aid of counsel.  As such, the statements were obtained in violation of the Sixth Amendment and must be suppressed.

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

20

## VI.      Conclusion

Green has been in law enforcement custody since the time of his arrest on June 30, 2006. He invoked his Fifth Amendment right to counsel immediately upon his arrest. Law enforcement never advised Green of his *Miranda* rights.   None the less, law enforcement engaged in the "questioning" and the "functional equivalent" of questioning of Green on June 30 and July 3, 2006. As such, Green's statements were obtained in violation of *Miranda* and must be suppressed.

Also as to the July 3rd statements, Green was transported from Asheville to Charlotte, North Carolina, for his initial appearance despite there being a Federal courthouse and a sitting magistrate and district judge in Asheville.  This two hour car ride with the FBI resulted in Green allegedly making more statements to the FBI.  The act of transporting Green two hours away for his initial appearance violated FRCrP 5, 18 U.S.C. § 3501(c), and the Sixth Amendment. As such, the statements of July 3rd must be suppressed on these grounds also.

**WHEREFORE**, the defendant respectfully moves the Court to grant his Motion to Suppress.

Respectfully submitted,

/s/ Patrick J. Bouldin
Assistant Federal Defender
629 S. Fourth Street
200 Theatre Building
Louisville, Kentucky  40202
(502)584-0525

Counsel for Defendant .

## Certificate of Service

I hereby certify that on December 10th, 2008, I electronically filed the foregoing with the

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

21

clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following: Marisa J. Ford, Esq., Assistant United States Attorney.


/s/ Patrick J. Bouldin

Office of the
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, KY 40202

Tel (502) 584-0525
Fax (502) 584-2808

22